UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                    Criminal No. 06-315 (DSD/FLN)

           Plaintiff,

           v.                                              **REPORT AND**
                                        **RECOMMENDATION**

Jesus Alfredo Lara, 09,

           Defendant.

_____

Tracy L. Perzel, Assistant United States Attorney, for the Government.
James B. Sheehy, for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on September

18 and 19, 2007, on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and

Seizure [#321] and Defendant's Motion to Suppress Statements, Admissions and Answers [#322].

At the hearing, the Government presented testimony from Minnesota State Patrol Trooper Douglas

L. Rauenhorst and Tim Shanley, who was, in April 2007, a Senior Special Agent with the Minnesota

Bureau of Criminal Apprehension and was assigned to the Highway Criminal Enforcement Group

with the Minnesota State Highway Patrol. The Government submitted 12 exhibits into evidence.[1]

---

[1] Government's Exhibit 1 is Trooper Douglas Rauenhorst's CV. Government's Exhibit 2 is a packet of documents containing the certifications of Trooper Rauenhorst's narcotic detector dog, Sonja. Government's Exhibit 3 is a black and white photo of the driver's seat of the car at issue. Government's Exhibit 4 is a black and white photo of the car's back seat. Government's Exhibit 5 is a black and white photo of the trunk and its contents. Government's Exhibit 6 is a black and white photo of a suitcase containing bricks of marijuana. Government's Exhibit 7 is a DVD of Defendant Lara's traffic stop. Government's Exhibit 8 is the search warrant allowing the police to search a residence on Ross Ave. which is Defendant Lara's home. Government's Exhibit 9 is a color photo of the car's driver's seat. Government's Exhibit 10 is a color photo of the car's back seat. Government's Exhibit 11 is a color photo of the trunk and its contents. Government's Exhibit 12 is a color photo of a suitcase containing bricks of marijuana.

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons which follow, this Court recommends Defendant's Motions be **DENIED**.

## I.   FINDINGS OF FACT

Trooper Rauenhorst and Agent Shanley testified at the suppression hearing on September 19 and 20, 2007.  Trooper Rauenhorst has been employed by the Minnesota State Patrol since 1996 as a patrolman and K-9 handler.  As of April 2007, Special Agent Shanley has been employed with the Minnesota Bureau of Criminal Apprehension for thirty three years and was a member of a Drug Enforcement Administration task force.

Trooper Rauenhorst testified that on April 6, 2007, he was on standard patrol duties in his marked Crown Victoria squad car on Interstate 35 ("I-35") near Albert Lea, Minnesota.  Around 2:00 p.m., Trooper Rauenhorst was driving northbound near Albert Lea  in the far left lane of the highway when he noticed a green, four door Jeep Cherokee in the right lane, driving slowly.  As Trooper Rauenhorst was passing the Jeep, the driver looked over and his eyes widened at the sight of the trooper and he quickly exited the highway at Exit 11.  Trooper Rauenhorst watched the Jeep, noted its license plate number and observed that the turn signal was not activated.  Rauenhorst testified he intended to stop the green Jeep to issue a citation for failing to signal, but he could not exit in time.

A search of the license plate number indicated the car was registered to a St. Paul resident named Julio Nunez.  Rauenhorst radioed this information and a description of the car to Agent Shanley, who was in a separate squad car, so that Shanley could assist in locating the green Jeep.

Twenty minutes later, Trooper Rauenhorst was traveling southbound on I-35 when he pulled into a median area to turn around. From the median area, he saw the green Jeep again traveling northbound on I-35 and it appeared the car was being driven by the same driver. As the Jeep approached and passed, Rauenhorst also noticed objects hanging from the Jeep's rear view mirror, in violation of Minnesota Statute sec. 169.71. Trooper Rauenhorst pulled onto the highway and activated his emergency lights to stop the Jeep.[2]

After the green Jeep and the squad car pulled over, Trooper Rauenhorst approached the green Jeep from the passenger side. The Defendant was in the driver's seat, a female, later identified as Leticha Carmona, was in the passenger seat and an infant was in a car seat in the rear driver's side seat. Rauenhorst noticed the strong odor of air fresheners and perfume or cologne. Inside the vehicle, he saw two air fresheners, one near the steering wheel and one hanging between the two front seat head rests (Gov. Ex. 9 and 10.) Rauenhorst had been taught in a training that air fresheners and perfumes are typically used as masking agents to conceal the odor of drugs.

Trooper Rauenhorst informed Mr. Lara and Ms. Carmona that the purpose of the stop was to issue a citation for hanging objects from the rear view mirror, in violation of Minn. Stat. § 169.71, and for failing to signal a lane change, in violation of Minn. Stat. § 169.20, subd. 5. Trooper Rauenhorst noticed that the driver appeared nervous and did not make eye contact with him. Rauenhorst asked the driver if he had a license. The Defendant did not but he did provide a Minnesota identification card bearing the name Jesus Lara and the address on Ross in Ramsey,

---

[2] When the emergency lights in the squad car are activated, a video recorder activates and records the subsequent stop. This mechanism allows for the stop to be recorded. (See Gov. Ex. 7.)

MN.  Trooper Rauenhorst asked if Ms. Carmona had a license because the unlicensed Defendant

could not drive the vehicle.  Ms. Carmona provided a Kansas driver's license.

Trooper Rauenhorst then asked Mr. Lara to come back to the squad car with him while he

performed checks on Mr. Lara and Ms. Carmona.  Rauenhorst walked back to and entered the

front driver's side of his squad car.  Lara walked to the rear passenger side, opened the door,

entered the squad car and closed the door.  The rear of Trooper Rauenhorst's squad car is divided

by a perforated plexiglass wall.  This arrangement allows for his narcotics detecting dog, Sonja,

to sit in the rear seat behind the driver's seat and a person to sit in the rear passenger seat without

coming into contact with one another.  Sonja has a mild demeanor and usually sleeps when she is

in Trooper Rauenhorst's back seat, even when there is a person in the back seat.  Sonja was in

her caged seat behind the driver's seat when Mr. Lara opened the rear passenger door and sat

down in the rear passenger seat.

Trooper Rauenhorst has been working with Sonja since April of 1999.  Sonja has been

nationally certified by the United States Police Canine Association every year since 1999 to

detect marijuana and a number of other drugs.  (Gov. Ex. 2.)  Sonja was last certified in May of

2007.  (*Id.*)  In a national narcotics detection competition in 2007,  Sonja placed second out of 97

dogs.  Trooper Rauenhorst has conducted 1,089 narcotic searches with Sonja since June of 1999.

(Gov. Ex 1.)

Trooper Rauenhorst and Sonja train together two days per month.  During this training,

Sonja is tested to distinguish between odors commonly associated with drugs (*e.g.*, the odor of

plastic bags, rubber gloves, packing tape) and the drugs themselves.  This training is intended to

prevent dogs from alerting to such associated odors.  Sonja is also trained to detect large

4

amounts of U.S. currency.  When a narcotics dog smells a drug, it is trained to give an "indication," which is usually placing a paw on the object or area where the dog smells the drugs.  In addition to giving an indication, narcotics dogs also "alert" to the smell of drugs.  An alert is the dog's natural, untrained reaction to smelling the drug and usually consists of a head snap or sniffing.   According to Trooper Rauenhorst, Sonja has had no problems with false alerting.  Trooper Rauenhorst makes between 50 and 100 traffic stops per month, four to five percent of which involve a dog sniff.

While Lara was sitting in the back seat of the car, Trooper Rauenhorst noticed that Sonja, who could smell Mr. Lara through the perforations in the plexiglass, began sniffing intensely at the Defendant, thereby alerting to one or more of the drugs she is trained to detect.  In Mr. Rauenhorst's experience, it is not common that Sonja alerts on people.  Trooper Rauenhorst asked Mr. Lara if he had drugs and Mr. Lara did not make eye contact and appeared very nervous.

Trooper Rauenhorst also noticed that Mr. Lara's key chain had only one key on it - the key to the Jeep.  In his training, Rauenhorst was taught that this fact is an indication that the vehicle might be stolen.  At this point, Trooper Rauenhorst called Agent Shanley for backup because he wanted Agent Shanley to assist in speaking with Ms. Carmona and in seeking a Spanish-speaking officer to translate some questions he wanted to ask Mr. Lara.  Agent Shanley has been with the Bureau of Criminal Apprehension for 33 years.

When Agent Shanley arrived, he approached the Jeep and began speaking with Ms. Carmona.  She told him that Mr. Lara lived in Minnesota and had come to Kansas to pick her up. She said that they were staying in Minneapolis for a few days, during which time she was going

to look for a job as an optician's assistant.  When Agent Shanley asked the name of the optical

company or optician, Ms. Carmona stated that she could not remember the name.  She also said

that the only bag in the vehicle that belonged to her was the pink bag in the back seat.  Shanley

could observe from outside the vehicle that the pink bag was small, contained diapers and other

children's items, and did not appear to contain any adult clothing. (Gov. Ex. 10.)

While Agent Shanley was speaking to Ms. Carmona, Trooper Rauenhorst gave Mr. Lara

the ticket for driving without a license and a warning for failing to signal a lane change and for

hanging objects from the rear view mirror.  Rauenhorst returned the Minnesota identification

card and proof of insurance to Lara.  At this point in the stop, Trooper Rauenhorst felt that he

still needed to figure out who owned the car and whether or not Mr. Lara had permission to drive

it.  Trooper Rauenhorst and Mr. Lara had exited the squad car when Jake May, a Bureau of

Criminal Apprehension interpreter, called to facilitate communication.  Trooper Rauenhorst gave

the phone to Mr. Lara .  Prior to the phone conversation, Mr. Lara had not been placed in hand

cuffs but had not been told he was free to leave.  Because it was a windy day, it was difficult for

Mr. Lara to hear Mr. May and therefore Mr. Lara went back to the squad car and sat in the back

seat with the back door open.  Around this time, Trooper Rauenhorst conferred with Special

Agent Shanley who had been speaking to the Jeep passenger, Ms. Carmona.  According to

Trooper Rauenhorst, there was a discrepancy between Mr. Lara's story and Ms. Carmona's story

about the trip.  Mr. Lara had said that when he arrived in Kansas City, Ms. Carmona was there

and the two of them spent about a week and a half together in Kansas City before coming to

Minnesota.  On the other hand, Ms. Carmona told Mr. Shanley that when Mr. Lara arrived in

Kansas City, Ms. Carmona was in Mexico.  When she returned from Mexico, Mr. Lara was in

6

Kansas City and the two of them spent a week and a half there together before coming to Minnesota.  Trooper Rauenhorst asked Ms. Carmona for permission to search the car, but Ms. Carmona stated that it was not her vehicle and therefore was not going to give permission.  Mr. Lara did not consent to a search of the car either.

After permission to search the car was denied, Officer Rauenhorst decided to run Sonja around the car.  (*See* Gov.. Ex. 7 at 14:56.28.)  Sonja alerted in the front of the Jeep by sniffing intensely.  She also indicated at the rear passenger side door by scratching at the door.  Officer Rauenhorst then searched the car and asked Agent Shanley to keep Mr. Lara away.  When he opened the trunk, Rauenhorst smelled the odor of marijuana and proceeded to find four large suitcases filled with bricks of marijuana.  (Gov. Ex. 6 and 12.)  Officer Rauenhorst testified that it was not surprising to him that the dog alerted in the front of the car when the drugs were located in the trunk because it was such a windy day and the wind was blowing from the south to the north (*i.e.*, from the back of the car to the front of the car).

## II.   CONCLUSIONS OF LAW

### A.   Trooper Rauenhorst made a legal traffic stop after observing objects hanging from the green Jeep's rear view mirror.

When a police officer observes a traffic violation - no matter how minor - the officer has probable cause to make a traffic stop.  *United States v. Lyon*, 486 F.3d 367, 371 (8th Cir. 1996).  In this case, Trooper Rauenhorst observed the green Jeep driven by the Defendant with objects hanging from the rear view mirror, in violation of Minn. Stat. § 169.71, subd. 1.  At the time, Trooper Rauenhorst was parked in a median area and had ample time to observe the green Jeep approaching as it headed northbound on I-35.  In his memorandum of law, Defendant suggests that Trooper Rauenhorst could not have observed the objects hanging from the mirror because

the windshield may have been tinted.  This is plainly not true, as indicated in the pictures taken

of the car.  *See* Gov. Ex. 9.  The Defendant also suggests that he was driving too fast for Trooper

Rauenhorst to be able to observe the objects.  The Court finds Trooper Rauenhorst's testimony to

be credible and that it was certainly possible he could have seen the objects hanging from the

mirror from his vantage point at the median.

**B.  Trooper Rauenhorst did not unlawfully detain Mr. Lara.**

The Defendant argues that Officer Rauenhorst detained Mr. Lara longer than was

reasonably required to issue the traffic citation and therefore the dog sniff and subsequent

recovery of drugs from the car should be excluded because they were recovered while Mr. Lara

was being unlawfully detained.   "In light of the lawfulness of the initial stop, the question

becomes whether the resulting detention . . . was 'reasonably related in scope to the

circumstances which justified the interference in the first place.'" *United States v. Ramos*, 20

F.3d 348, 351 (8th Cir. 1994) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).  When conducting

a traffic stop, an officer may detain a motorist while the officer performs routine tasks related to

the stop, which typically include writing a citation and completing computerized checks of a

driver's license, vehicle registration and criminal history.  *U.S. v. Lyons*, 486 F.3d 367, 371 (8th

Cir. 2007).  The officer may also inquire about the occupants' destination, route and purpose for

the trip.  *U.S. v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005).  The officer may also request that a

motorist sit in the squad car.  *United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993);

*United States v. Richards,* 967 F.2d 1189, 1192-93 (8th Cir.1992).

However, an officer cannot detain a motorist after the initial stop is completed unless the

officer has "a reasonably articulable suspicion for believing that criminal activity [is] afoot."

*Lyons*, 486 F.3d at 371 (quoting *U.S. v. Beck*, 140 F.3d 1129, 1134 (8th Cir. 1998)).  "If, during a

traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying

contraband, he had 'justification for a greater intrusion unrelated to the traffic offense.'" *U.S. v.*

*Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994) (en banc) (quoting *U.S. v. Cumings*, 920 F.2d 498,

502 (8th Cir. 1990).

      "Whether particularized facts known to the officer amount to an objective and reasonable

suspicion of criminal activity is determined in light of the totality of the circumstances." *United*

*States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994).  When considering the circumstances

involved, due weight must be given "to the factual inferences drawn by the law enforcement

officer" in light of the officer's reason and experience.  *U.S. v. Arvizu*, 534 U.S. 266, 277 (2002).


"Although each factor giving rise to reasonably suspicion may appear innocent when viewed by

itself, a combination of factors may warrant further investigation when viewed together." *U.S. v.*

*Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (quoting *U.S. v. Linkous*, 285 F.3d 716, 720 (8th Cir.

2002).  "Whether a particular detention is reasonable in length is a fact-intensive question, and

there is no per se time limit on all traffic stops." *U.S. v. Olivera-Mendez*, 484 F.3d 505, 510 (8th

Cir. 2007).

      Initially, Rauenhorst's traffic stop was reasonably related to issuing the Defendant a

citation for driving with objects suspended from the rear view mirror.  As is customary,

Rauenhorst asked for the driver's license.  The Defendant did not have a license and, instead

produced a Minnesota identification card.  Upon learning that the driver did not have a valid

license, Rauenhorst asked for the passenger's license to verify that she could drive the car if

needed. He asked the Defendant to come back to the squad car with him while he ran checks on

identification card and license. The trooper's actions were clearly related to issuing the

Defendant a citation.

Given the totality of the circumstances, Rauenhorst developed a reasonably articulable

suspicion that the vehicle was carrying contraband therefore had a justification for a greater

intrusion unrelated to the traffic offense. The first time Officer Rauenhorst came into contact

with the vehicle, he drove past it on the highway and the driver, upon seeing the squad car,

widened his eyes and quickly exited the highway. When Rauenhorst initially pulled the vehicle

over and spoke with the occupants, he noticed the strong smell of air fresheners, scents which he

learned in his training are commonly used to mask the smell of drugs. In this initial conversation

the driver was nervous and refused to make eye contact. He did not have a driver's license. The

car did not belong to him. The Defendant's key ring had a single key, a fact the trooper learned

in training may indicate that a car is stolen. The Defendant was traveling on I-35, a commonly

known drug trafficking corridor between Kansas City and the Twin Cities. *See U.S. v. Blaylock*,

421 F.3d 758, 769 (8th Cir. 2005) (holding that a relevant factor in determining legality of a stop

was travel on a known drug corridor). Thus, Trooper Rauenhorst was justified in investigating

the circumstances further and detaining the defendant beyond the time necessary to issue the

citation.

The Defendant also argues that the dog sniff should have been conducted earlier. This

argument is not persuasive. In *Illinois v. Caballes*, 543 U.S. 405, 408 (2005), the U.S. Supreme

Court noted that conducting a dog sniff does not "change the character of a traffic stop that is

lawful at its inception and otherwise conducted in a reasonable manner." Trooper Rauenhorst

10

delayed conducting the dog sniff until he had addressed the issues the stop presented. Rauenhorst conducted the license and background checks on the Defendant and Ms. Carmona. During the checks, Sonja alerted on the Defendant who was sitting in the back of the squad car. At that point, Rauenhorst had not finished issuing the citation.  Further, he was having difficulty communicating with the Defendant and sought help from Agent Shanley in securing a translator. Rauenhorst was also trying to verify that the Defendant had not stolen the vehicle.  Given that he was trying to deal with a number of issues at one time, it was not unreasonable that he engaged in the dog sniff over 35 minutes after the traffic stop.

The Defendant also contends that Sonja did not alert on the Defendant when he was sitting in the back of the squad car.  He argues that no sounds of sniffing can be heard on the DVD of the stop; that had the dog actually alerted, Trooper Rauenhorst would have immediately conducted the dog sniff.  The Court finds that Rauenhorst gave credible testimony that Sonja alerted.  Furthermore, the DVD does show Rauenhorst asking, in a somewhat surprised voice, at a time in the conversation when drugs had not yet been discussed, if the Defendant had any on his person.  The DVD footage is consistent with Rauenhorst's testimony in that it indicates that something, at that moment, alerted Trooper Rauenhorst to the fact that the Defendant might have drugs on his person.  Furthermore, it was reasonable for Rauenhorst to wait to conduct the sniff until after he had issued the citation and looked into whether or not the car had been stolen.

**C.  Law enforcement had probable cause to search the car**.

The Defendant argues that Officer Rauenhorst's dog, Sonja, did not alert when the officer ran her around the green Jeep and therefore there was no probable cause to search the vehicle. Law enforcement must have probable cause to search a vehicle without a warrant.  *U.S. v.*

11

*Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (citing *U.S. v. Ameling*, 328 F.3d 443, 448 (8th Cir.

2003).  Probable cause exists where there is a "fair probability that contraband or evidence of a

crime will be found in a particular place." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238

(1983)).  When a drug sniffing dog positively indicates for the presence of a controlled

substance, an officer has probable cause to search a vehicle.  *United States v. Gomez*, 312 F.3d

920, 926 (8th Cir. 2002) (a drug dog's positive indication alone is sufficient to establish probable

cause for the presence of a controlled substance if the dog is reliable).  In order to establish a

dog's reliability, the government  need only establish that the dog has been trained and certified

to detect drugs.  *Donnelly*, 475 F.3d at 955.  It is not necessary to give a detailed explanation of

the dog's track record or education.  *Id.*

  In this case, Sonja alerted on the vehicle.  The dog alerted both in the front of the vehicle

and on the rear passenger door.  On the DVD of the traffic stop, it is difficult to see the dog alert

on the front of the car but it appears that both the officer and the dog lingered in the front of the

car as they circled it and Officer Rauenhorst gave credible testimony that Sonja started sniffing

intensely at the front of the car.  The DVD does show Sonja indicating at the rear passenger door

by scratching at it.  In addition, the government presented evidence not only that Sonja was

certified as a narcotics detector dog, but also that she was uncommonly talented in sniffing

drugs, having placed second in a national competition in 2007.

  Because Sonja alerted on the car, Officer Rauenhorst had probable cause to search the

vehicle and therefore the drugs found in the car should not be suppressed, nor should the

evidence seized at Defendant Lara's home later that day.

## III.    RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that Defendant's Motion Suppress Evidence Obtained as a Result of Search

and Seizure [#321] and Defendant's Motion to Suppress Statements, Admissions and Answers

[#322] should both be **DENIED**.


DATED: October 4, 2007                                  s/ *Franklin L. Noel*
                                                        FRANKLIN L. NOEL
                                                        United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **October 23, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **October 23, 2007** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.